IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SHERYL SLOTNICK,

        Plaintiff,

v.

CAROLYN W. COLVIN

        Defendant.

No. C 13-02283 RS

**ORDER REMANDING FOR FURTHER PROCEEDINGS**

## I.  INTRODUCTION

Plaintiff Sheryl Slotnick appeals, through a motion for summary judgment, a decision of the defendant Commissioner of Social Security ("the Commissioner") denying Slotnick's application for disability benefits under the Social Security Act ("SSA"). According to Slotnick, the Administrative Law Judge ("ALJ") assigned to her case committed a litany of errors in evaluating her application. She seeks reversal of the ALJ's decision and a determination that she is entitled to benefits. While the ALJ indeed committed a number of errors, further administrative proceedings must be held before it can be determined whether the errors were harmless or whether Slotnick is instead entitled to a finding that she is disabled under the SSA. For the reasons and on the terms discussed below, this case will be remanded to the Commissioner.

## II.  BACKGROUND[1]

In May of 2007, Slotnick was diagnosed with lumbar degenerative spine disease and chronic back pain by Dr. William Baumgartl, a treating pain specialist. (AR 540-541). A February 2008 CT scan revealed moderate diffuse spondylotic changes of the spine. (AR 312). In April of that

---

[1] This synopsis is based on the certified administrative record ("AR").

1  year, Lawrence Dickinson, an orthopedic surgeon, performed surgery on Slotnick's L5 nerve root.
2  (AR 302-303). The surgery resulted in "no improvement" and she continued to seek treatment from
3  Dr. Baumgartl. (AR 429, 533-555,590). Hoping to alleviate her pain, Slotnick received Botox and
4  steroid injections and tried various medications. (AR 254, 540-41). Apart from narcotic pain
5  medication, which offered some relief but produced unpleasant side effects, none of the treatments
6  yielded sustained benefits. (AR 86).

Slotnick filed for SSA Title II disability benefits[2] on November 5, 2009. (AR 163-164). At an October 26, 2011 hearing held before an ALJ, Slotnick testified in support of her application. (AR 69-98). She submitted a variety of documentary evidence, including affidavits prepared by her husband and sister. (AR 242-45). Slotnick also submitted a Medical Source Statement ("MSS") prepared by Dr. Baumgartl, along with voluminous treatment notes documenting her lengthy medical history. (AR 253-650).

At the request of the government, Slotnick was examined by Dr. Calvin Pon, who submitted an orthopedic and residual functional capacity ("RFC") assessment. (AR 356-58). Relying on Dr. Pon's findings, Dr. Linda Pancho prepared a concurring RFC assessment. (AR 359-364). Based on that RFC, a vocational expert testified at the hearing that despite her impairments, Slotnick was capable of employment in the national economy as a mail sorter, courier, parking lot attendant, assembler, addresser, and check weigher. (AR 92-93). The VE testified, however, that Slotnick would be "unemployable" if a more restricted RFC provided by Dr. Baumgartl were credited. (AR 96).

On December 1, 2011, the ALJ issued a written decision. (AR 52-62). Evaluating Slotnick's application pursuant to the five-step, sequential process mandated by the SSA regulations, the ALJ considered: (1) whether Slotnick was ineligible for benefits because she was engaged in substantial gainful activity; (2) whether Slotnick was ineligible because she did not have a medically severe impairment or combination of impairments; (3) whether Slotnick's impairment met or equaled an impairment listed in the SSA regulations; (4) whether the impairment prevented

---

[2] To qualify as disabled under the SSA, an applicant must establish that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Slotnick from performing past relevant work; and, if so, (5) whether Slotnick was nonetheless capable of performing other work in the national economy. 20 C.F.R. §§ 404.1520, 416.920.

Following this five-step inquiry, the ALJ first determined that Slotnick had not engaged in substantial gainful activity since filing her application for benefits. (AR 54). Proceeding to step two, the ALJ found that Slotnick suffered from severe impairments including degenerative disc disease, lumbar facet disease, and chronic pain disorder. (AR 54). At step three, however, the ALJ ruled that Slotnick's ailments were not equivalent to any of the impairments listed in the applicable SSA regulations. (AR 55). Next, crediting the opinions of Dr. Pon and Dr. Pancho and giving "no weight" to Dr. Baumgartl's opinion, the ALJ determined that Slotnick had the capacity to perform some light work, as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b). (AR 55). Specifically, the ALJ found that Slotnick was capable of lifting or carrying ten pounds frequently and twenty pounds occasionally, could sit, stand or walk for six hours of an eight hour workday, and had the ability to climb, stoop, crouch, squat and crawl occasionally and frequently climb stairs. (AR 55). Based on this RFC, the ALJ determined that Slotnick could perform past relevant work as a grocery checker and was also capable of performing the requirements of a number of other jobs existing in the national economy. (AR 60-61). As a result, the ALJ concluded that Slotnick was not disabled. (AR 61).

The Social Security Administration Appeals Council denied Slotnick's request for review of the ALJ's decision. (AR 1-6). Soon after, Slotnick filed a complaint in this court. In her motion for summary judgment, Slotnick seeks reversal of the ALJ's decision and a finding that she is disabled under the SSA.

## III.   LEGAL STANDARD

Under 42 U.S.C. § 405(g), a district court has jurisdiction to review the Commissioner's final decision denying benefits under the SSA. An ALJ's decision to that effect must be affirmed if it is supported by substantial evidence and free of legal error. *Beltran v. Astrue*, 700 F.3d 386, 388 (9th Cir. 2012). Substantial evidence is defined as "more than a mere scintilla but less than a preponderance—it is such reasonable evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam). In determining whether a decision is supported by substantial evidence, the court must examine the

3

1 administrative record as a whole, considering all the facts. *Drouin v. Sullivan*, 966 F.2d 1255, 1257
2 (9th Cir. 1992). If the evidence supports more than one rational interpretation, the court must defer
3 to the ALJ's decision. *Id*. at 1258.

4 If the ALJ's decision is not based on substantial evidence or contains legal error, the
5 reviewing court may remand for further evidence, or enter a judgment affirming, modifying, or
6 reversing the Commissioner's decision. 42 U.S.C. § 405(g). "If additional proceedings can remedy
7 defects in the original administrative proceedings, a social security case should be remanded."
8 *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (internal citation and quotation marks
9 omitted).

## III.   DISCUSSION

### A.   Treating Physician's Opinion

Slotnick first contends that the ALJ erred by rejecting the opinion of Dr. Baumgartl, her treating physician of roughly four years. To justify the dismissal of a treating physician's opinion in favor of an examining physician's conflicting views, an ALJ must point to "specific and legitimate reasons" supported by substantial evidence. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [an] interpretation thereof, and making findings." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). A treating physician's opinion may be rejected if it is inconsistent with the medical records or inadequately supported by clinical findings. *Id.*

In his MSS, Dr. Baumgartl stated that Slotnick could carry or lift no more than two pounds, could not crouch, crawl, or engage in activities requiring reaching, and was only capable of walking or standing for five minutes at a time. Dr. Baumgartl further discussed Slotnick's inability to sustain focus and concentration as a result of her pain, the side effects of narcotic medications, and resulting sleep disturbances. Finally, he opined that Slotnick's "scans and x-rays coupled with her monthly physical examinations reveal extreme tenderness and are consistent with her complaints of severe pain." Consequently, the doctor concluded, Slotnick was incapable of consistently working on a full-time basis in a normal work environment. (AR 459). Reasoning that Dr. Baumgartl's opinion was "not supported by his own treatment notes," the ALJ gave "no weight" to the MSS.

(AR 56). The ALJ accorded "great weight," however, to the notes themselves as "contemporaneous descriptions of the claimant's condition." (AR 56, 59).

It is unclear why the ALJ concluded that the MSS was "not supported" by the treatment notes. In the notes, Dr. Baumgartl documented Slotnick's persistent lower back and leg pain over the course of years, arising from a diagnosis of degenerative disc disease. (*See, e.g.,* AR 437-38, 444-45). The treating physician also consistently reported Slotnick's failure to achieve any sustained pain relief from various treatments, including a 2008 surgery and multiple courses of spinal injections. (*See, e.g.,* AR 429, 436, 470, 478). In addition, Dr. Baumgartl frequently documented that Slotnick suffered from "significant sleep problems." (*See, e.g.,* AR 473, 481). In these respects, Dr. Baumgartl's "contemporaneous descriptions" of Slotnick's condition were wholly consistent with the opinion he later expressed in the MSS.

Neglecting the foregoing portions of the treatment notes, ALJ relied instead on Dr. Baumgartl's common observation that Slotnick had normal motor and sensory functions of her lower bilateral extremities, walked with a normal gait, had negative straight leg raising, had no ankle swelling, and had reflexes of 1+ for the left knee and bilateral ankles and 2+ for her right knee. (AR 57). The ALJ, however, offered no explanation of *why* these findings were inconsistent with the MSS, which made no reference to Slotnick's lower bilateral motor and sensory functions, gait, straight leg raising capabilities, ankle swelling, or reflexes. It is not at all self-evident that the aforementioned physical characteristics are incompatible with the limitations described in Dr. Baumgartl's MSS.

In discrediting Dr. Baumgartl's opinion, the ALJ further observed that the treating physician had "recommended trying the most conservative and least invasive treatments first, even though, in some cases, these may be the least effective." (AR 57). While Dr. Baumgartl's notes indeed include the foregoing language,[3] a fair reading of the record reveals that, in fact, Slotnick actively

---

[3] The following sentence appears in many of Dr. Baumgartl's treatment notes: "The patient was advised that I am recommending trying these approaches generally following the most conservative and least invasive treatments first, even though, in some cases, these may be the least effective." (AR 432, 439, 447, 455). This appears to be boilerplate language, used in the "Patient Decision Making and Counseling" portion of Dr. Baumgartl's treatment notes template. In any event, Slotnick's actual treatment history belies the ALJ's conclusion that she pursued only the "most conservative" and "least effective" treatments. *C.f. Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014) ("In any event, we doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment.").

5

pursued aggressive treatments.  In April 2008, Slotnick underwent left extra foraminal decompression surgery, which included the shaving of bone in her back.  (AR 357, 429).  As the surgeon, Dr. Dickinson, and Dr. Baumgartl both reported, this invasive procedure did not alleviate Slotnick's pain.  (AR 290, 445).  Slotnick also received back injections on at least four occasions but obtained no lasting relief.  (AR 285, 429, 497).  Notwithstanding boilerplate language to the contrary, the record simply does not support the ALJ's conclusion that Dr. Baumgartl recommended "the most conservative and least invasive treatments."

The ALJ improperly relied on nonexistent conflicts between the treatment notes and the MSS and an untenable reading of Slotnick's treatment history as bases for rejecting Dr. Baumgartl's opinion.  These were not "specific and legitimate reasons" supported by substantial evidence.[4]  Yet, those errors notwithstanding, the ALJ may have nevertheless had sufficient cause for rejecting Dr. Baumgartl's opinion.  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) ("An error is harmless if it is 'inconsequential to the ultimate nondisability determination.' ").

Notably, an ALJ is entitled to reject a treating physician's opinion if it is "based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041.  In this case, Dr. Baumgartl's opinion regarding the severity and disabling effects of Slotnick's ailments was predicated largely on his patient's own accounts of the extent of her pain.  The ALJ determined that those accounts were not credible.  If that finding was appropriate, the ALJ was likewise empowered to discount Dr. Baumgartl's report in favor of the conflicting opinions of Dr. Pon and Dr. Pancho.  The propriety of the ALJ's determination that Slotnick lacked credibility is addressed below.  As discussed in more detail *infra*, the final resolution of that question will require further administrative proceedings.

B.   Claimant's Credibility

While an ALJ is not "required to believe every allegation of disabling pain," to discredit a claimant's symptom testimony when a severe medical impairment has been established, the ALJ

---

[4] The ALJ also noted Dr. Baumgartl's observation, throughout the treatment notes, that Slotnick "had a normal presentation and no inappropriate pain displays." (AR 57).  Slotnick contends that, read in context, this language simply embodied the treating physician's conclusion that she was not exhibiting drug-seeking behavior.  Regardless of the proper interpretation of this language, the fact that Slotnick "had a normal presentation and no inappropriate pain displays" is not alone substantial evidence sufficient to discredit Dr. Baumgartl's opinion.

must provide "specific, cogent reasons for the disbelief." *Orn v. Astrue,* 495 F.3d 625, 635 (9th Cir. 2007) (internal citations and quotation marks omitted).  Where, as here, the ALJ does not find "affirmative evidence" that the claimant is a malingerer, the "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* (internal citations and quotation marks omitted).  "The clear and convincing standard is the most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).

At the hearing, Slotnick testified that she suffered from "constant" and "debilitating" pain in her left lower back and leg.  (AR 78).  According to Slotnick, the pain rendered her unable to complete even basic household tasks without assistance. (AR 80-81).  She further testified that she could only stand or walk for five minutes without resting and was almost completely incapable of lifting and carrying objects. (AR 86-87).  Finally, Slotnick explained that while narcotic pain medication helped "somewhat," it made her feel "foggy," a side effect compounded by her inability to get more than three hours of sleep each night.  (AR 83, 87-88).

Despite acknowledging that Slotnick was afflicted with medically determinable impairments of the back, the ALJ found that Slotnick's "statements concerning the intensity, persistence and limiting effects" of her pain were "not credible." (AR 59).  The ALJ first noted that over the course of her visits with Dr. Baumgartl, Slotnick frequently characterized her average weekly pain as a five on a scale of ten. (AR 59).  Apparently, the ALJ deemed these pain levels to be inconsistent with Slotnick's later testimony of "debilitating" agony. (AR 78).  As Slotnick explained during her visits to Dr. Baumgartl, however, based on her own subjective criteria, "tolerable" pain would have been characterized by a zero or one on a scale of ten.  (AR 428, 443, 469).  Any level of pain greater than one on Slotnick's personal scale prevented her from living "in reasonable and tolerable comfort." (*See, e.g.,* AR 477).  Accordingly, Slotnick's reports of average weekly pain ranging from a three to an eight did not conflict with her later testimony of "debilitating" pain.  (AR 451, 477).  These imagined deficiencies in Slotnick's characterization of her pain were not "clear and convincing" reasons sufficient to justify an adverse credibility determination.   Nor did the ALJ's conclusory reliance on Dr. Baumgartl's sundry observations of his patient's physical condition—for example, that Slotnick had "no complaints of pain in her lower extremities" and "appeared to walk with a normal gait"—warrant rejection of her testimony.

7

The ALJ also found Slotnick's failure to pursue certain treatments probative to her credibility. (AR 59). On several occasions, Dr. Baumgartl reported that he and Slotnick had discussed the possibility of treatments including "steroids, radio-frequency neuroloysis, surgery, and pump/stim." When Slotnick "declined all these," Dr. Baumgartl was left wondering "what she wanted me to do for her at this point." (*See, e.g.,* AR 444). While an ALJ has discretion to discount symptom testimony where the claimant has pursued an unduly conservative treatment program, as discussed, Slotnick's history with the medical establishment cannot be reasonably characterized as tentative. Moreover, "although a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

As discussed, Slotnick underwent invasive back surgery in 2008. The procedure did not alleviate her symptoms, and Dr. Dickinson advised against further surgery. (AR 285-86, 459, 462). Slotnick also received injections of Botox, steroids, and other substances on several occasions; the injections provided no lasting relief. (AR 497). Scarred by these futile efforts, Slotnick apparently became reluctant to pursue further aggressive options and decided to rely instead on narcotic pain medication, which she took for years, on a daily basis. (*See, e.g.,* AR 430, 479). Considered in its entirety, Slotnick's lengthy treatment history corroborates, rather than undermines, her testimony of severe pain. *See, e.g., Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) (credibility of claimant's symptom testimony bolstered by willingness to undergo "extensive" treatment). Because Slotnick did not pursue an unduly conservation treatment regimen, the ALJ's erroneous finding to the contrary was not a "clear and convincing" reason sufficient to justify an adverse credibility determination.

Finally—and most significantly—the ALJ found Slotnick's credibility lacking because she misrepresented her recent employment history in her hearing testimony. (AR 60). Slotnick testified that she tried to resume working as a grocery checker on June 1, 2010 but was forced to stop on August 14.[5] (AR 78, 85). The ALJ then asked whether Slotnick had "done any other work for pay

---

[5] While Slotnick's testimony was imprecise, contextual clues strongly suggested that she meant to say she had abandoned her attempt to return to work on August 14, 2010. It is also possible, however, that she intended to say she had ceased working on August 14, **2011**. *See* AR 78 ("June

since 2009 other than the time that you tried to go back to work." Slotnick replied that she had not. (AR 78). In the written decision, the ALJ pointed to a number of 2011 treatment notes reflecting that Slotnick had, in fact, "returned to part-time work as a grocery checker since at least December 2, 2010." (AR 60). Indeed, the following language is found, repeated verbatim, in Dr. Baumgartl's treatment notes spanning the period from July 8, 2010 to October 16, 2011: "She feels her pain is worse since returning to work part time. She continues to work now as a grocery checker." (AR 462, 470, 478, 486, 497, 505, 514, 522). If, as indicated by the treatment notes, Slotnick did engage in part-time work from late-2010 to October 2011, her misleading testimony to the contrary would easily qualify as a "clear and convincing" reason justifying the ALJ's adverse credibility determination.[6]

In her reply brief, Slotnick offers lukewarm explanations. Most substantively, she asserts that any inconsistency between her testimony and the treatment notes should be ignored because she was "taking narcotic medication" and "suffering from the effects of insomnia" during the hearing and was therefore "confused about certain dates."[7] If Slotnick indeed inadvertently offered muddled testimony, her counsel had ample opportunity to correct the record during the hearing. (AR 84-88). Counsel's failure to identify and remedy inconsistencies between her client's testimony and the treatment notes bars the argument that such inconsistencies should be deemed immaterial. On the other hand, Dr. Baumgartl's treatment notes are not necessarily reliable evidence of Slotnick's exact dates of employment, particularly in light of his apparent tendency to recycle language found in old notes.

---

1st and through August 14th"), AR 85 ("I left in August."). Although the ALJ reasonably construed her testimony to mean that she stopped working on that date in 2010, the transcript is inconclusive as to the meaning Slotnick intended to convey by her statements.

[6] As the Commissioner concedes, to the extent the ALJ relied on the mere fact that Slotnick attempted to resume work as support for the conclusion that her symptom testimony was not credible, it was error to do so. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations"). But, again, if Slotnick's testimony regarding her work history was indeed inaccurate, that would constitute a "clear and convincing" reason sufficient to warrant an adverse credibility determination.

[7] Slotnick also points out that a payroll record submitted in support of her disability application suggests that she had no 2011 earnings. (AR 203). That record, though, also appears to indicate that Slotnick earned nothing in 2010—which, based on Slotnick's testimony and other evidence in the record, cannot be true.

9

Because the record is ambiguous regarding Slotnick's work history from late-2010 through October 2011, this case will be remanded to the Commissioner for further proceedings. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) ("Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."). On remand, the ALJ shall consider any additional evidence submitted by the parties (including, if Slotnick so elects, further testimony) relevant to the claimant's history of paid employment from June 2010 through the date of the original administrative hearing. Based on that evidence, the ALJ shall reconsider the accuracy (or lack thereof) of Slotnick's October 26, 2011 testimony and shall reassess the claimant's credibility accordingly. If the ALJ again finds that Slotnick misstated her work history, depending on the exact content of the additional evidence to that effect, the claimant's description of the intensity, persistence, and limiting effects of her symptoms may permissibly be discredited. If, in contrast, the evidence demonstrates that Slotnick's testimony was not inaccurate, the ALJ will lack any clear and convincing reason to make an adverse credibility determination and must give appropriate weight to the claimant's description of the intensity, persistence, and limiting effects of her impairments.

C.   Residual Functional Capacity Determination

Finally, Slotnick argues that the ALJ erred in arriving at an RFC assessment based on the opinions of Dr. Pon and Dr. Pancho. If the ALJ improperly rejected Dr. Baumgartl's opinion, it was indeed error to base Slotnick's RFC on the capabilities described by the non-treating physicians. If, on the other hand, the ALJ was empowered to discount Dr. Baumgartl's opinion, the RFC was appropriate. *Batson v. Commissioner*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC opinion of treating physician which has been permissibly discounted). Like the other issues presented by Slotnick's appeal, this question cannot be definitively settled until the further administrative proceedings ordered herein have taken place.

Slotnick further claims that the ALJ improperly barred her from testifying regarding alleged inaccuracies in Dr. Pon's report, in violation of "the special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). Slotnick did, however, submit a pre-hearing brief arguing, in essence, that Dr.

Pon's report contained a number of bald lies about the examination he had conducted.[8] (AR 241). Based on her review of that brief, the ALJ concluded additional testimony would be unnecessary and, in her written decision, declined to credit Slotnick's "he said, she said" allegations. (AR 58, 88). Given the ALJ's determination that Slotnick's testimony regarding her limitations was incredible, it was also not error to reject her unverifiable accusations of dishonesty on the part of an examining physician.

Again, further proceedings may reveal that, contrary to the ALJ's initial findings, Slotnick's symptom testimony was credible and Dr. Baumgartl's corresponding opinion of her capabilities was therefore entitled to weight. In that hypothetical future, the ALJ will not be permitted to credit Dr. Pon's opinion over Dr. Baumgartl's in determining Slotnick's RFC. Assuming, however, that Slotnick is found incredible on remand, it was permissible for the ALJ to rely on Dr. Pon's opinion in support of the conclusion that Slotnick was not disabled.

### III.   CONCLUSION

This matter is remanded to the ALJ for further proceedings consistent with the terms of this order.

**IT IS SO ORDERED.**

Dated: May 13, 2015

RICHARD SEEBORG
United States District Judge

---

[8] Slotnick also argues that the ALJ should have discredited Dr. Pon's report because it incorrectly stated that she "underwent no lumbar spinal surgery." (AR 356). Elsewhere in the report, however, Dr. Pon reported Slotnick's "history of operative intervention to her low[er] back [in] April 2008." (AR 357). The report is ambiguous regarding what, if any, conclusions Dr. Pon drew from Slotnick's surgical history (or his possible misapprehension that she never had back surgery). As a result, Slotnick's claim that the report must be discounted on that basis is unpersuasive.